**In re Rodney Alan GILLEAD and Betty Jean McEady–Gillead aka Betty J. McEady, Debtors.**

**Bankruptcy No. 93–25771–A–13.**

United States Bankruptcy Court, E.D. California, Sacramento Division.

July 13, 1994.

Yvonne N. Aldama, Sacramento, CA, for Chapter 13 Trustee Lawrence J. Loheit.

Gary H. Gale, Law Office of White and Gale, Sacramento, CA, for debtors.

## MEMORANDUM OPINION

DAVID E. RUSSELL, Chief Judge.

### INTRODUCTION

The chapter 13 Trustee has objected to confirmation of the Debtors' Chapter 13 plan

on the grounds that it does not propose to allocate all of their disposable income to payments under the plan. The Trustee also argues that the plan has not been proposed in good faith and that the case should therefore be dismissed. On the other hand, the Debtors contend that they are proposing to pay as much as they feasibly can to the Trustee. The troubling problem that needs to be resolved is how to go about determining what is disposable income for chapter 13 purposes.

## FACTS

### The Debtors and Their Income

The Debtors are husband and wife. Mr. Gillead is a Vice–Principal employed by the Sacramento City Unified School District and Mrs. Gillead is an Associate Professor at California State University Sacramento who also does consulting work. Mr. Gillead's 9 year old daughter from a prior marriage resides with them every other weekend and for two weeks each summer. The Debtors have no other children.

The Debtors' schedule of current income shows that their annual gross income exceeds $100,000. Mrs. Gillead grosses $4,015[1] per month, while Mr. Gillead grosses $5,365 per month for ten months out of the year. To equalize his take home pay over 12 months, $720 is deducted each month from his gross pay. His other deductions consist of taxes, insurance and union dues of approximately $800 and $430 for his retirement. His net monthly take home pay is thus approximately $3,415 over 12 months. Deductions from Mrs. Gillead's monthly salary include taxes, insurance premiums, union dues and parking fees of approximately $880, and $175 for her retirement. In addition, she has consulting income of over $190 per month. She thus brings home $3,150 per month, although through February of this year, $280 per month was deducted from her pay check for previously overpaid salary.

After February of 1994, the Debtors' monthly take home pay should be at least $6,565. If they were to cease making the monthly contributions of $605 to their retirement plans, their take home pay would be $7,170.

### The Assets

The Debtors own their residence which they value at $235,000. They list personal property with a value in excess of $58,000, including almost $30,000 of exempt pensions and annuities. They own two motorcycles worth $1,300 and two automobiles, a 1989 Peugeot 405 MI–16 sedan valued at $5,375 and a 1990 Audi 100 sedan valued at $13,725.

One other item of personal property worthy of note is a 50″ large screen color television which they value at $800. The other items of personal property listed are typical items which can be found in most households and are not individually extraordinary in terms of value or quantity. It is noteworthy, however, that the Debtors' list of exemptions cover three and one half pages.

### The Creditors and the Plan

Home Federal Bank holds a first deed of trust on the Debtors' residence to secure an obligation of almost $198,000 and requiring monthly payments of $1,733, which includes real property taxes and insurance. The Internal Revenue Service ("IRS") filed a prepetition tax lien for 1990, 1991 and 1992 income taxes in the amount of $20,630 and is listed by the Debtors as fully secured by the equity in their residence and their other lien free assets. Golden One Credit Union is owed $7,880 which is secured by the Peugeot, Provident Central Credit Union is owed $19,180 on the Audi, and Mitsubishi Three Diamond is owed $3,140 on the 50″ TV set. The unsecured portion of these three loans is $10,300.

The only priority claim listed by the Debtors is the Franchise Tax Board in the amount of $2,700 for income taxes owed for 1990, 1991, and 1992.

On Schedule F the Debtors list unsecured debt totalling a little more than $34,000, consisting of credit card obligations of approximately $25,400 and credit line debt of ap-

---

**1.** For purposes of reviewing the categories of income and deductions, amounts have been rounded to the nearest $5.00.

proximately $8,600. Adding the unsecured portion of the auto and TV loans brings the total unsecured debt to approximately $44,300.

In their Chapter 13 plan, the Debtors propose to pay $805 per month to the Trustee for the first seven months of the plan (a total of $5,635) from August 5, 1993 through February 5, 1994. Thereafter, beginning March 5, 1994 plan payments would increase to $1,007 per month for an additional 53 months (for a total of $53,371). According to the Debtors, the total of these payments ($59,006) would be sufficient to pay all administrative fees and costs, priority claims and, except for the first deed of trust obligation on their residence, the total of the collateral value of the secured claims. Unsecured claimants would receive nothing under the plan. Payments to Home Federal Bank would be made outside the plan.

*The Debtors' Expenses and the Trustee's Objection*

■ Schedule J lists the Debtors' current monthly expenses totalling $5,495. The trustee objected to the reasonableness or necessity of certain specific expense items, such as food, clothing, laundry and dry cleaning, recreation, clubs and entertainment, a gardener, spring water, and cosmetics and haircuts. The Debtors responded by rationalizing the necessity for the disputed expense items, urging the court to find that the special circumstances of these Debtors make most, if not all, of their scheduled expenses necessary for their support. Although a critical review of the debtors' "budget" is an indispensable part of the process of determining whether a plan should be confirmed, and/or a case dismissed, it is not, by itself, determinative.

## DISCUSSION

*Good Faith and the Disposable Income Test*

Insofar as pertinent herein, 11 U.S.C. § 1325 provides that

(a) Except as provided in subsection (b), the court shall confirm a plan if—

(3) the plan has been proposed in good faith ...

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor;

. . .

■ 11 U.S.C. § 1325(b) was added to the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984. This amendment helps to clarify the meaning of "good faith" as used in subsection (a)(3). Debtors proposing to use all of their "projected disposable income" for three years to fund a plan would be acting in good faith. Such a standard does not require any minimum amount or percentage of payment to unsecured creditors. 5 *Collier on Bankruptcy* ¶ 1325.08[1] (15th ed. 1994). The legislative history, unfortunately, does not give much guidance regarding the meaning of "reasonably necessary" expenses as used in the definition for "disposable income." *Id.*

It's not surprising that courts have wrestled with the standard which should be applied in determining a debtor's reasonably necessary expenses. On the one hand courts have expressed an uneasiness about being required to make judgments regarding lifestyles and about the moral issues which emerge because what may be a reasonably necessary expense for one debtor might not be such to another debtor. *In re Sutliff,* 79 B.R. 151, 156–57 (Bankr.N.D.N.Y.1987). On the other hand courts recognize that bankruptcy judges are required by different Code sections to make very similar lifestyle determinations. *See* 11 U.S.C. § 523(a)(2)(C) ("luxury goods and services" do not include

goods or services reasonably acquired for the support and maintenance of the debtor); § 522(d)(10)(E) (a debtor is entitled to an exemption for a pension · or profit-sharing plan to the extent reasonably necessary for the support of the debtor); § 707(b) (court may dismiss a chapter 7 case if it finds that granting such relief would be a substantial abuse). As one court so aptly stated, "[i]t's an unpleasant job, but someone has to do it." *In re Rogers,* 65 B.R. 1018, 1021 (Bankr. E.D.Mich.1986).

Apparently neither the Ninth Circuit nor the Bankruptcy Appellate Panel for the Circuit have dealt with determining what is expenses are "reasonably necessary" in the context of a Chapter 13 case. Consequently, no bright line rules exist for testing the reasonableness of any specific item of expense listed by debtors in their monthly budgets. Nevertheless, there are some broad guidelines [2]. Cases from other jurisdictions are also instructive.

▮ In *In re Jones,* 55 B.R. 462 (Bankr. D.Minn.1985), the debtor's monthly budget showed $500 for one son's college tuition and $500 for another son's secondary school tuition. A creditor objected to the confirmation of the debtor's plan which had proposed a payment of 13.95% to unsecured creditors on the grounds that the debtor was not paying all of her disposable income into the plan. The court found that not only were the educational expenses excessive but that the monthly food budget of $515 and the house payment of $989 were high. 55 B.R. at 467. The court in *Jones* adopted the standard first set forth by *In re Taff,* 10 B.R. 101 (Bankr. D.Conn.1981) where the court considered whether a debtor could exempt payments received under a pension plan as "reasonably necessary" for support pursuant to 11 U.S.C.

§ 522(d)(10)(E). Quoting *Taff,* the *Jones* court held that:

> the reasonably necessary standard requires that the Court take into account other income and exempt property of the debtor, present and anticipated ... and that the appropriate amount to be set · aside for the debtor ought to be sufficient to sustain basic needs not related to [the debtor's] former status in society or the lifestyle to which he is accustomed. (parentheses added).

55 B.R. at 466. The standard set forth in *Jones* has been adopted by other courts. *In re Sutliff,* 79 B.R. 151 (Bankr.N.D.N.Y.1987); *In re Greer,* 60 B.R. 547 (Bankr.C.D.Cal. 1986). This court adopts the *Jones* standard with some clarification.

▮ First, the court agrees with the Debtors that the standard requires that reasonably necessary expenses be determined on a case by case basis. Second, the standard must be flexible to allow a debtor some latitude with regard to what can be claimed as a discretionary expense and in what amounts. Although some discretionary expenses are necessary for maintenance and support, *Matter of Anderson,* 143 B.R. 719, 721 (Bankr.D.Neb.1992), the amount claimed must be subject to a reasonableness limitation. Finally, the court would agree that a debtor with a high income who is paying substantial amounts into the plan may retain a greater dollar amount for discretionary expenses than a debtor of more modest income who proposes little or no payment to unsecured creditors. 143 B.R. at 721.

*Looking at the Facts*

▮ There are certain facts in almost every case that makes the case unusual. In this case, it is the Debtors' substantial "take home," or discretionary, income. Very few debtors need to decide how to dispose of over $7,000 per month on two adults and a "part time" child. Also of note is the type of assets and debt listed by the Debtors. Unpaid

---

**2.** The Ninth Circuit in *In re Kelly,* 841 F.2d 908 (9th Cir.1988) considered when a debtor's chapter 7 case could be dismissed for substantial abuse under 11 U.S.C. § 707(b). The court panel held that a debtor's ability to pay his debts will, standing alone, justify a § 707(b) dismissal. 841 F.2d at 915. In footnote 9 the court scrutinized the debtor's expenses and agreed with the bankruptcy court that the debtors' $500 per month entertainment expenses were excessive.

*Id.* at fn. 9. The court stated that expenses for going out to dinner, entertaining, buying toys for the children or going to the movies were not reasonably necessary for the support of a debtor or a dependent of the debtor. *Id.* Permitting a debtor to retain this income would be grounds for rejection of the chapter 13 plan. *Id.* Although *Kelly* was a substantial abuse case, it indicates what expenses the Ninth Circuit would consider excessive.

income taxes, an expensive house, high priced cars, luxury items such as 50″ TV sets and motorcycles, and unsecured debt consisting of credit card charges, extensively used lines of credit, and undercollaterized secured debt, all indicate a considerable lack of financial discipline. It appears that these Debtors have "mortgaged their future" and spent their way into bankruptcy.

However, both debtors in this case are working professionals and their expenses are obviously higher than those for the average family. While cognizant of that fact, that reason alone is insufficient to justify allowing them to substantially maintain their prepetition lifestyle.[3] Debtors ask this court to ignore the decisions from other courts which have denied confirmation of a plan based primarily upon a debtor's retention and payment for a luxury item at the expense of unsecured creditors. *E.g., In re Chrzanowski*, 70 B.R. 447 (Bankr.D.Del.1987) (country club dues, IRA, charitable contributions); *In re Hedges*, 68 B.R. 18 (Bankr.E.D.Va.1986) (boat used for recreation); *In re Rogers*, 65 B.R. 1018 (Bankr.E.D.Mich.1986) (1984 Corvette).

The court has reviewed all of the expenses of the Debtors taking into account their declaration which gives further explanation and a breakdown of some of the questioned expenses. For instance, although the Debtors list $560 per month for food, that amount is actually composed of toiletries of $40, restaurant expenses of $151, and actual grocery expenses of $368. *See* Declaration of Debtors filed with the court on December 28, 1993. The court has attempted to categorize the Debtors' expenses according to whether they appear to be necessary and reasonable, acceptable but excessive, or discretionary. A table setting forth this effort is set forth in Appendix A to this Memorandum.

Although the Debtors ask this court to determine with specificity the expenses which are excessive and in what amounts, this court declines to set forth any rigid rules. At best, even the characterization of the expenses on Appendix A is quite subjective, based upon this court's perception of what might be reasonable, *vis a vis* what might be necessary[4]. And in this case, where the Debtors have such a wide latitude in their choices, the court is particularly reluctant to make judgment calls on specific items. Nevertheless, based on the overall view of this case, the court is convinced that the characterization of the expenses in each of the three categories on Appendix A is not inappropriate. However, any future decisions regarding disposable income will be dependent upon the unique facts and circumstances of each case.

*Conclusion*

The Debtors propose to pay $5,635 over seven months and then $1,007 per month for 53 months to fund their Chapter 13 plan in this case. Those payments, according to the Debtors, are sufficient to pay all of their obligations except for the unsecured debt. Payments of $1,007 per month represent only about 14% of their monthly take home pay. Their total unsecured debt of approximately $44,300 could be paid off in 36 months with monthly payments of $1,353[5]. Adding that to the $1,007 per month that the Debtors propose to pay gives a total monthly payment of $2,360, or approximately 33% of their monthly take home pay. That would still leave $4,740 per month to live on, which is certainly more than sufficient for a reasonable life style, even for professionals. Even with deferred maintenance on their resi-

---

**3.** The Debtors try to make out a case that they have adjusted their lifestyle by not budgeting any amounts for gifts, church donations, or vacations. The Debtors also state that they have stopped making payments toward their annuities in the amount of $208 per month for Mr. Gillead and $150 for Mrs. Gillead. Although the Debtors' actions are laudable, those expenses are discretionary and not reasonably necessary for support and maintenance. The court would expect such budget adjustments from chapter 13 debtors as a matter of course.

**4.** *E.g.,* the monthly payment of $1,733 on the note secured by the Debtor's residence is well above the amount necessary to provide a decent abode; but permitting the Debtors to retain their residence makes enough economic sense to find that the monthly payment is "reasonable" rather than "excessive."

**5.** Administrative expenses in Chapter 13 cases are roughly 10% of the debts paid. 10% of $44,300 is $4,430. The total payments necessary to pay off the unsecured debt is thus $48,730. That sum divided by 36 months is $1,353.61 per month.

dence, they have enough to pay their creditors in full over 36 months. They should be able to do it over 60 months with even less of a strain.

In this case, a review of the Debtors' monthly expenses convinces this court that the Debtors are not committing all of their disposable income to the plan, and on that basis the court sustains the Trustee's objection. It is thus unnecessary to discuss whether the Debtors' plan has been proposed in good faith. Instead, assuming the Debtors amend their plan in light of this decision, the Trustee's good faith objection can be raised anew.

Since the Debtors do not intend to pay all of their claims in full and the Trustee has objected to confirmation, the Debtors must be willing to pay all of their projected disposable income into the plan. 11 U.S.C. § 1325(b)(1)(B). The excessive amounts claimed for some of their acceptable expenses and the large amount they spend each month on discretionary items convince this court that the Debtors' plan fails the disposable income test.

The foregoing shall constitute the court's findings of fact and conclusions of law. An appropriate order will be issued.

## APPENDIX A

| Expense Item | Necessary & Reasonable | Acceptable but Excessive | Discretionary |
|---|---|---|---|
| Mortgage (includes taxes & ins) | $1,733 | | |
| Electricity & Heating | 175 | | |
| Water & Sewer | 51 | | |
| Phone | | $ 125 | |
| Security | 21 | | |
| Cable | | | $ 45 |
| Home Maintenance | | 300 | |
| Toiletries | 40 | | |
| Restaurant Expenses | | | 151 |
| Groceries | 368 | | |
| Work Lunches | | | 280 |
| Clothing | | 200 | |
| Laundry & Drycleaning | | 100 | |
| Medical & Dental | 10 | | |
| Transportation | | 250 | |
| Newspaper & Magazines | 14.50 | | |
| Periodicals, Books, Dues, & Journals | | | 99.50 |
| Entertainment | | | 86 |
| Life Insurance | $ 46 | | |
| Auto Insurance | | $ 242 | |
| Flood & Earthquake Insurance | | | $ 62 |
| Vehicle Registration | | 65 | |
| Alimony & Support | 360 | | |
| Gardener | | | 75 |
| Spring Water | | | 25 |
| Prescriptions | 15 | | |
| Vehicle Repairs | | 100 | |
| Tires | | 35 | |
| Health Club | | | 75 |
| Haircuts | 51 | | |
| Hair Products & Cosmetics | | | 45 |
| Wife's Tenure & Retention Expenses | | 200 | |
| Husband's Dues & Conferences | | | 50 |
| **TOTALS** | **$2,884.50** | **$1,617.00** | **$993.50** |